1

1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
2
    Case No. 18-mj-1117-MEH
3   _____

4   UNITED STATES OF AMERICA,

5        Plaintiff,

6   vs.

7   ISAAC PADILLA,

8        Defendant.
    _____
9

10           Proceedings before SCOTT T. VARHOLAK, United States

11   Magistrate Judge, United States District Court for the

12   District of Colorado, commencing at 10:41 a.m., July 9, 2018,

13   in the United States Courthouse, Denver, Colorado.

14   _____

15           WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17   _____

18                       APPEARANCES

19           BRYAN FIELDS, Attorney at Law, appearing for

20   the Plaintiff.

21           KELLY CHRISTL, Attorney at Law, appearing

22   for the Defendant.

23   _____

24    PRELIMINARY REVOCATION, IDENTITY, AND DETENTION HEARING

25

```
 1                    P R O C E E D I N G S

 2              (Whereupon, the within electronically recorded

 3  proceedings are herein transcribed, pursuant to order of

 4  counsel.)

 5              THE COURT:  This is 18-mj-1117.  Can I have entries

 6  of appearance, please.

 7              MR. FIELDS:  Good morning, Your Honor.  Bryan

 8  Fields for the United States.

 9              THE COURT:  Good morning.

10              MS. CHRISTL:  Good morning, Your Honor.  Kelly

11  Christl on behalf of Isaac Padilla who is present in custody.

12              THE COURT:  Good morning.  So we are here for

13  identity hearing, preliminary hearing, and detention hearing

14  on a supervised release petition that is pending out of South

15  Dakota.

16              I received a waiver of identity hearing.  Let me go

17  over that first.  Mr. Padilla, have you -- is this your

18  signature on the waiver of identity hearing?

19              MR. PADILLA:  Yes.

20              THE COURT:  And did you -- did anybody force you or

21  threaten you to sign this waiver?

22              MR. PADILLA:  No.

23              THE COURT:  And did you waive your right to an

24  identity hearing following discussion with counsel?

25              MR. PADILLA:  Yes.
```

1          THE COURT:  Okay.  Then I find that you have

2    knowingly and intelligently waived your right to an identity

3    hearing and will remove the issue of identity from today's

4    hearing, which then brings us to the issue of the preliminary

5    and detention hearing.

6          Is the Government ready to proceed on those?

7          MR. FIELDS:  We are, Your Honor.

8          THE COURT:  Is the defense ready to proceed?

9          MS. CHRISTL:  Yes, Your Honor.

10         THE COURT:  Okay.  Government want to call its

11   first witness.

12         MR. FIELDS:  Yes.  I would call probation officer

13   to the stand.

14         THE COURT:  Okay.

15               WALTER VANNI,

16   having been first duly sworn, was examined and testified as

17   follows:

18         UNIDENTIFIED SPEAKER:  State and spell your name

19   for the record.

20         THE WITNESS:  Walter Vanni, V-, as in Victor,

21   A-N-N-I.

22               DIRECT EXAMINATION

23   BY MR. FIELDS:

24    Q    Good morning, sir.  Where do you work?

25    A    I work for the United States Probation Office in

1   the district of Colorado.

2       Q    Are you familiar with the supervision of a

3   gentleman named Isaac Padilla?

4       A    Yes.

5       Q    How are you familiar with that case?

6       A    I have been supervising his case since March 1,

7   2018.

8       Q    How did the case come here to Colorado?

9       A    Originally he was at a halfway house in the

10  District of South Dakota when he was released on December 20,

11  2017.

12      Q    Was that a halfway house, Community Alternatives of

13  the Black Hills?

14      A    Yes.

15      Q    What was Mr. Padilla's underlying conviction?

16      A    Sexual contact with a minor.

17      Q    What was the sentence imposed in that case?

18      A    He received ten months' imprisonment with a

19  five-year term of supervised release to follow.

20      Q    And what were the conditions of that term of

21  supervised release?

22      A    His mandatory and standard conditions and eight

23  special conditions that he had at sentencing to include a

24  modification of an additional ten special conditions to

25  include halfway house based here in Colorado.

1     Q     What was special condition number 4?

2     A     On the judgment?

3     Q     Yes.

4     A     He must submit to a sex offender assessment,

5  participate in sex offender treatment, and submit to

6  polygraph examinations as directed by the probation officer

7  or the treatment provider.

8     Q     And what was special condition number 5?

9     A     He must reside and participate in a residential

10  reentry center as directed by the probation office.  He will

11  be classified as a prerelease case.

12     Q     Now, you mentioned that Mr. Padilla was at

13  Community Alternatives of the Black Hills.  What caused him

14  to be -- come here to Colorado?

15     A     Originally there was multiple relocation requests

16  when Mr. Padilla was in the Bureau of Prisons.  We had three

17  of those that we rejected due to his inability to find a

18  viable residence in Colorado.  On the fourth request we came

19  up with a plan to have him reside here in Colorado at a

20  halfway house with the hope that he would secure employment,

21  save enough money for first month's rent and deposit, and

22  also participate and successfully participate, I should say,

23  and progress in sex offender treatment.

24     Q     Did he enter a halfway house here in Colorado?

25     A     He did.

1    Q    What was the name of that halfway house?

2    A    Independence House.

3    Q    And did he start a sex offender treatment?

4    A    He did.

5    Q    At what location?

6    A    RSA.

7    Q    What is RSA?

8    A    It's a sex offender treatment agency.

9    Q    And are there certain conditions to that program?

10   A    Yes, he's got a treatment contract.

11   Q    Are you familiar with the substance of that

12   contract?

13   A    Yes.

14   Q    Generally what -- what does that contract cover?

15   A    Multiple provisions, but to participate and

16   successfully complete the treatment program to include

17   accountability of the offense conduct.

18   Q    And what does that mean, accountability of the

19   offense conduct?

20   A    That you are admitting to the facts, that you

21   remember what happened during this time, you take

22   responsibility for those actions in order for you to progress

23   further in treatment.

24   Q    Are you familiar with something called the denier's

25   protocol?

1       A     Yes.

2       Q     What is that?

3       A     When they complete an intake assessment, they

4  listen to the defendant's statement at that time and will

5  determine if they're amenable to treatment.  If they feel

6  that they should not be in sex offender treatment at that

7  time, they'll place them in the denier's protocol, which you

8  could call the pretreatment, if you will, and they give them

9  12 weeks of services to include weekly groups, two individual

10 sessions a month, with a primary therapist to work through

11 the denial and accept responsibility of the offense

12 discussing remembering the acts that were committed and

13 taking full accountability for what has happened.

14      Q     During the course of your work as a probation

15 officer, have you become familiar with various sex offender

16 treatment programs?

17      A     Yes.

18      Q     In your experience, is this denier's protocol

19 unusual?

20      A     No.

21      Q     How many cases would you say you've supervised

22 involving sex crimes?

23      A     I have supervised sex offenders solely in the

24 district of Colorado for the past six years.  Prior to that I

25 was a state probation officer in the 17th Judicial District

1    in the state of Colorado as a sex offender intensive

2    supervision specialist for about four or five years.  I would

3    say over ten years of just working with sex offenders.

4        Q    In your experience, are you familiar with any

5    programs that do not have a similar denier's protocol type

6    arrangement?

7        A    No.

8        Q    Are you -- do you know what happened on June 26,

9    2018?

10       A    He was unsuccessfully terminated from RSA's

11   program.

12       Q    For what purpose or for what reason?

13       A    After completion of (inaudible) denier's protocol

14   with no statement of accountability.

15       Q    Do you have a copy of the discharge paperwork?

16       A    I do.

17       Q    May we see it.

18           MR. FIELDS:  I would like to mark it as an exhibit.

19   Let me show it to defense counsel.

20           MS. CHRISTL:  Judge, may I just take a moment --

21           THE COURT:  Sure.

22           MS. CHRISTL:  -- to write some notes.

23           MR. PADILLA:  Your Honor, I would move that that

24   discharge paperwork be marked as Exhibit A and be admitted

25   into evidence for purposes of this hearing.

1          THE COURT:  Any objections?

2          MS. CHRISTL:  No objection, Your Honor.

3          THE COURT:  Give me one moment to review it.  Okay.

4   Go ahead.

5          MR. FIELDS:  Thank you, Your Honor.  Has it been

6   admitted?

7          THE COURT:  It is.

8          (Exhibit A was admitted.)

9          MR. FIELDS:  Thank you.

10     Q     (By Mr. Fields) As a result of that discharge, was

11   a petition filed in the district of South Dakota?

12     A     Correct.

13     Q     And what was the basis for the petition?

14     A     The basis for the petition was did fail to

15   participate in sex offender treatment as directed by special

16   condition 4, did fail to reside and participate in the

17   residential reentry center in that he was unsuccessfully

18   discharged from sex offender specific treatment in violation

19   of special condition number 5.

20     Q     Are you familiar with the petition that was filed

21   in that matter?

22     A     Yes.

23     Q     Was it signed under penalty of perjury by U.S.

24   probation officer Chanda Volker (ph)?

25     A     Correct.

1           MR. FIELDS:  I'll show this to defense counsel.

2     This is a copy of the petition in this case.  This is

3     Document Number 44.

4           THE COURT:  It is already a matter record in the

5     case.

6           MR. FIELDS:  Okay.  Then I won't admit it as an

7     exhibit.

8     Q     (By Mr. Fields) And so you mentioned that

9     supervision was transferred here because of the support not

10    being in place for the defendant.  Do you recall that?

11    A     Yes.

12    Q     Since he has been transferred here has that

13    actually worked out?  Does he have a support system in place

14    here in Colorado?

15    A     I'm not aware of any support that he has discussed

16    with me.  I know that prior to his release there was a

17    request to live with an aunt.  There was also a request to

18    live with a cousin who was with an uncle.  Both of those were

19    denied because they were not viable residents, but since then

20    we haven't had discussion other than I know that he was going

21    to request potential money from family, but other than that,

22    there hasn't been contact that I'm aware of that they

23    approved visitation at the halfway house.

24    Q     The residing with the aunt, with the cousin or with

25    the uncle, why was that not viable?

1      A    The apartment complex that the aunt lives in does

2  not allow felons/sex offenders.  The cousin who lives with

3  the uncle stated that his uncle would not allow the defendant

4  to register as a sex offender at his address, and also the

5  cousin currently has a pending felony warrant.

6      Q    Are you aware of any other relatives with whom the

7  defendant could reside here in Colorado?

8      A    I am not.

9      Q    Does the defendant have any employment?

10     A    He does not.

11     Q    Are you familiar with -- does he have a vehicle or

12 a means to get to South Dakota?

13     A    He does not.

14     Q    Are you aware of any way by which he would be able

15 to get to South Dakota?

16     A    Marshal transport.

17          MR. FIELDS:  I have no further questions, Your

18 Honor.

19          THE COURT:  Cross.

20          MS. CHRISTL:  Thank you.

21               CROSS-EXAMINATION

22 BY MS. CHRISTL:

23     Q    Mr. Vanni, you said that marshal transport is the

24 only way you know of him getting to South Dakota?

25     A    That I'm aware of, yes.

1      Q    Okay.  And he doesn't need to be in custody for

2    that, correct?

3      A    He doesn't need to be in custody?

4      Q    Correct.

5      A    For marshal transport?

6      Q    Correct.

7      A    Not that I'm aware of.

8      Q    All right.  And certainly there are buses that go

9    from Denver to Rapid City, South Dakota?

10     A    Yes.

11     Q    And those -- he does have family in the Denver

12   area, correct?

13     A    Yes.

14     Q    You talked about how Mr. Padilla was initially in

15   South Dakota under supervision, correct?

16     A    For just over two months, I believe.

17     Q    Okay.  And generally if someone can't transfer to a

18   new jurisdiction unless they're in compliance with the

19   supervision, correct?

20     A    No.

21     Q    Okay.  Well, Mr. Padilla was in compliance with

22   supervision in South Dakota, correct?

23     A    I -- again, we don't take compliance as a criteria

24   to accept a case.  If there was a violation that hadn't been

25   resolved, then we would take that into account.  In speaking

1    with his probation officer, he was denying the offense and

2    that he had a deceptive sex history polygraph, and they were

3    working with him and concerned about his lack of progress.

4    We had a conversation that he's going to come here, he's

5    going to -- the same things are going to happen.  He would be

6    placed in denier's protocol if he doesn't admit to the

7    offense and they're going to discharge him in 90 days if he

8    doesn't take accountability and he would have to return to

9    South Dakota.  That was the conversation we had.

10        Q    So you're saying that he had a conversation -- you

11   had a conversation with his probation officer in South Dakota

12   who told you that he was not admitting to the offense?

13        A    Correct.

14        Q    Mr. Padilla did plead guilty to this offense,

15   correct?

16        A    Correct.

17        Q    This was not a case that went to trial, correct?

18        A    Correct.

19        Q    And to the best of your knowledge, he got

20   acceptance of responsibility points out the guidelines for

21   accepting responsibility for this offense, correct?

22        A    Correct.

23        Q    This conversation that you had with his probation

24   officer, when was this?

25        A    Prior to his transfer to the district of Colorado.

1     Q   Could you give me the month?

2     A   We spoke in January and February.

3     Q   Okay.  And during that conversation, she told you

4 about how he had been attending sex offender treatment at a

5 place called Community Alternatives of the Black Hills?

6     A   I do not recall the name.

7     Q   Okay.  But he was attending treatment and residing

8 at a halfway house there?

9     A   Again, I don't know where he was attending

10 treatment, but, yes, he was residing at that halfway house.

11    Q   And you -- as far as you know, he was in compliance

12 in South Dakota?

13    A   No.

14    Q   Because he was not accepting responsibility?

15    A   Correct.

16    Q   All right.  And by not accepting responsibility you

17 mean he didn't say what?

18    A   He said that he did not recall the offense.

19    Q   Okay.  And in fact, you're familiar somewhat with

20 Mr. Padilla because you supervised him, right?

21    A   Correct.

22    Q   You know what his mental health needs are and other

23 needs that he needs on supervision, correct?

24    A   Correct.

25    Q   One need of Mr. Padilla is alcohol treatment,

1    correct?

2        A    Yes.

3        Q    Because Mr. Padilla had a significant debilitating

4    alcohol problem, correct?

5        A    I wouldn't classify it as that, but he had an

6    alcohol problem, yes.

7        Q    Okay.  Since the age of 16?

8        A    I would have to review the presentence report, but

9    that probably sounds about right.

10       Q    Okay.  And he was drinking at least a pint of

11    alcohol a day?

12       A    Again, I don't have any specifics.

13       Q    Okay.  You enrolled Mr. Padilla in substance abuse

14    treatment here, correct?

15       A    I just want to see if it was a dual or just

16    substance abuse.  If you could just give me one second,

17    please.  It was dual, (inaudible), so to see if both mental

18    health and substance abuse at once.

19       Q    Okay.  And also know that Mr. Padilla, in fact, his

20    alcoholism took a turn for the worse right around the time of

21    the offense in this case because his father died, correct?

22       A    I am not aware.

23       Q    Okay.  You knew Mr. Padilla has been in compliance

24    with his alcohol treatment, correct?

25       A    Again, I would have to go through the history to

1    see if he had any missed appointments with his primary

2    therapist, so he does individual sessions, so I would have to

3    double check.  There may have been a missed -- again, I would

4    have to go through my notes.

5         Q    Please go through your notes --

6         A    But as far as him -- but as far as him showing up

7    and talking with him, yes, he was doing that.

8         Q    Please go through your notes and see if he was in

9    compliance with this alcohol and mental health?

10        A    I don't have those notes in front of me right now.

11        Q    Okay.  Well, you knew you were testifying today,

12   right?

13        A    I did not.

14        Q    Okay.  You knew that this case was set for a

15   preliminary hearing today?

16        A    Correct.

17        Q    And a detention hearing today?

18        A    Correct.

19        Q    And you didn't think the fact that Mr. Padilla's

20   compliance in other areas of supervised release were

21   relevant?

22        A    Yes, they are, but, again, we -- I'm looking at the

23   violations in front me.

24        Q    Well, have you spoken to his therapist?

25        A    His (inaudible) therapist?

1     Q    Yes.

2     A    Yes, we speak at least monthly.

3     Q    Okay.  And Mr. Padilla's therapist has reported

4  that he is participating in treatment?

5     A    They were really working through his accountability

6  also in his discussions of anything that has happened in his

7  past he states that he was blackout drunk and doesn't

8  remember that.  Those are -- that was kind of what they were

9  mostly working on is him working through that too.

10     Q    Regarding the offense, you weren't there, correct?

11  You don't know how much Padilla -- Mr. Padilla had to drink

12  the day of his offense?

13     A    I was not there, you're right.

14     Q    And the RSA counselor, Amber Gully (ph), who signed

15  the letter, was not aware of how much Mr. Padilla had to

16  drink on the day of the offense, correct?

17     A    Mrs. Gully did not know exactly how much he had

18  drank, no.

19     Q    And his therapist didn't know how much Mr. Padilla

20  had to drink on the date of the offense?

21     A    I would assume not.

22     Q    So if this offense was alcohol driven, would it be

23  fair to say that Mr. Padilla might not remember the offense?

24     A    Again, I can't speak for him.

25     Q    But you agree that someone might not remember

1   something that happened when they were blackout drunk?

2        A    In my experience, no.  As far as me speaking with

3   people that have drank an excessive amount and they have

4   talked about how they were blackout drunk and do not remember

5   pieces of it, they still remember portions of the offense

6   conduct, and I think in speaking with Mr. Padilla he would

7   say the same thing, that he remembers portions of the

8   offense -- I'm sorry, the night of the offense, but he

9   doesn't want to admit to the actual offense itself.

10        So when you have one person talking about I

11   remember being in the kitchen, I remember hanging on, I

12   remember doing this, but then when you get to the actual

13   offense conduct, they say they were blackout drunk.  You

14   know, we work through that usually; we do that in treatment

15   to kind of get over that hump so then they take

16   responsibility and they can progress in treatment.

17        Q    Have you read any of the plea paperwork in

18   Mr. Padilla's case?

19        A    I have not.

20        Q    Where he admits to the actions as described by the

21   victims?

22        A    Again, I have not read it.

23        Q    Okay.  Well, wouldn't that be an indicator that

24   Mr. Padilla has accepted responsibility and taken

25   accountability for his actions?

1    A    No.

2    Q    No?  It would not?

3    A    It would not.

4    Q    Okay.  The only way that Mr. Padilla can accept

5    responsibility and take accountability for his actions you

6    said is through remembering the incident?

7    A    As far as him being able to continue with his sex

8    offender treatment, yes.

9    Q    Okay.  So this is a requirement of RSA, correct?

10   A    This is a requirement of sex offender treatment in

11   the state of Colorado.

12   Q    Okay.  Well, we're not -- the requirement under

13   Mr. Padilla's supervision or special condition of supervision

14   is that he submit to a sex offender assessment, correct?

15   A    Correct.

16   Q    He did that, correct?

17   A    I just want to stop you real fast, if I could.  I

18   also wanted to remind you that he does have additional

19   condition number 5 in the modification that has additional

20   information with sex offender specific eval treatment, but go

21   on, I apologize.

22   Q    He submitted to a sex offender assessment?

23   A    Correct.

24   Q    He participated in sex offender treatment?

25   A    Again, unless he is working through denier's

1    protocol, that is not considered participating.

2         Q    Well, how often was Mr. Padilla going to RSA?

3         A    He had a group once a week and he would meet with

4    his individual therapist twice a month.

5         Q    And he did that for four months in Colorado?

6         A    No.  He did that for 12 weeks.

7         Q    Okay.  Well, and he did that for about two months

8    in South Dakota?

9         A    I'm not too sure exactly when he began.  I would

10   assume probably sometime in January and then he left there

11   end of February to be here March 1, so I would say six weeks

12   probably.

13        Q    And he never missed any appointments?

14        A    In South Dakota?

15        Q    Or here.

16        A    I'm not sure about South Dakota, but here he went

17   to his weekly group.

18        Q    He never missed?

19        A    Correct.

20        Q    So he was participating in sex offender treatment?

21        A    Showing up does not mean participation.  There is a

22   lot of components that go into participation.

23        Q    He submitted to a polygraph examination?

24        A    Which was deceptive, yes.

25        Q    And you know the name of the person who reviewed

1    the polygraph and opined that it was deceptive?

2         A    The polygrapher's name or the treatment agency?

3         Q    The polygrapher.

4         A    I think it was Nat Smith, but I'm not 100 percent

5    positive.

6         Q    Does he work at RSA?

7         A    He works for RSA poly.

8         Q    Okay.  And that's all he does is polygraphs of sex

9    offenders?

10        A    Correct.

11        Q    Do you have a list of the questions that were asked

12   and the answers that were given?

13        A    I do not have them in front of me, no.

14        Q    Do you have them somewhere?

15        A    Yes.

16        Q    Where?

17        A    In my office.

18        Q    And do you know who those questions are?

19        A    Yeah.  To the best of my ability, basically

20   remembering the offense, engaging in any additional behaviors

21   with the victim, but mostly focusing on remembering and

22   whether or not he -- you know, it was truly blackout drunk

23   and did not remember the actual offense conduct.

24        Q    Mr. Padilla has been residing and participating in

25   a residential reentry center, correct?

1       A    He has been residing there, yes.

2       Q    He has been living at Independence House on

3    Federal?

4       A    South Federal, yes.

5       Q    He has been in compliance with the requirements of

6    the halfway house?

7       A    No.

8       Q    He has -- you haven't filed any violations,

9    correct?

10       A    This violation here.

11       Q    Okay.  Well, this is the only noncompliance with

12    the halfway house?

13       A    No.

14       Q    The halfway house has requirements about

15    breathalyzers, correct?

16       A    Yes.

17       Q    He gets a breathalyzer every time he returns to the

18    halfway house, correct?

19       A    I'm not sure if he does.  I believe that's what

20    they should be doing.

21       Q    They haven't given you any indication to believe

22    that Mr. Padilla has been drinking, correct?

23       A    Not that I'm aware of, no.

24       Q    He gets UAs at the halfway house?

25       A    Correct.

1      Q    You have not been notified of any positive UAs?

2      A    I have not.

3      Q    Mr. Padilla -- you're hinting that he had some

4    violation arrived late at one point to the halfway house?

5      A    He has four additional writeups at the halfway

6    house.

7      Q    Okay.  For minor conduct, correct?

8      A    I mean, I think being unaccounted for 12 hours in

9    the community beginning at 1 o'clock in the morning and

10    returning at noon is a significant violation.

11      Q    When did that occur?

12      A    That occurred after he was released from Denver on

13    the four active warrants he had in Denver county.

14      Q    On what date?

15      A    March 22.

16      Q    So shortly after he got here?  You said he got here

17    in the beginning of March.

18      A    Right.  So what happened is when he went -- he got

19    here in March.  He went to register as a sex offender.  They

20    ran him, found his warrants, took him into custody and he was

21    in custody for a short period of time.  They released him,

22    and at 1 o'clock in the morning, instead of him returning to

23    straight to the halfway house, he decided to stay out.

24      Q    Well, the halfway house at some point locks its

25    doors for the night, correct?

1      A     No.

2      Q     And makes it difficult to get back in?

3      A     No.  You ring the bell and you can go in.

4      Q     Mr. Padilla -- one of the restrictions of being in

5   the halfway house is that you not have a cellular phone,

6   correct?

7      A     No.

8      Q     Or that you not have a smartphone, but you're

9   allowed to have a cellular phone?

10     A     Sex offenders cannot have smartphones in the

11  halfway house.

12     Q     Okay.  So he has been in compliance with that

13  condition?

14     A     I do not know if he has a smartphone.

15     Q     Well, you haven't been notified by Independence

16  House that he does, correct?

17     A     I have not been notified, no.

18     Q     And they do search for these things?

19     A     I don't know what they are -- what it looks like as

20  far as how often they search or when they do that.

21     Q     Well, you've supervised lots of people who are not

22  allowed to have smartphones in halfway houses, correct?

23     A     Correct.

24     Q     And do you generally get notified by the halfway

25  house if someone is violating that condition?

1      A      If for some reason something came up and they

2  discovered a smartphone, but it doesn't always happen during

3  the search.  They could just be walk around doing a round and

4  they notice that somebody had the phone and they tried to

5  hide it real fast because they didn't expect somebody showing

6  up or something.

7      Q      You have no reason to believe that Mr. Padilla has

8  a smartphone, do you?

9      A      I have no idea if he has a smartphone.

10     Q      But you have no reason to believe that he has a

11  smartphone?

12     A      Do I have reason to believe?  I mean, I have had

13  offenders in the past have smartphones and not let me know.

14  So as far as me knowing if he has one, I cannot answer that

15  question because I don't know.

16     Q      You -- Mr. Padilla has been -- so wouldn't you

17  agree that Mr. Padilla has been residing in and participating

18  in a residential reentry center?

19     A      I agree that he was residing in, yes.

20     Q      Okay.  And you don't think that his taking UAs at

21  the halfway house would be participating in?

22     A      Again, participation includes a lot of variables.

23  Once somebody has assessed (inaudible) reports and then also

24  has been unsuccessfully terminated from sex offender

25  treatment, then the director rejects their placement.

1     Q    You -- one of the requirements is that they be

2  looking for employment, correct?

3     A    Correct.

4     Q    And Mr. Padilla, in fact, found a job that was

5  willing to hire him through a temporary agency last week,

6  correct?

7     A    I did not speak with the potential employer, but I

8  was aware that he had a job lead, yes.

9     Q    Okay.  And he was supposed to get the paperwork

10 going and start last week, correct?

11    A    The processes, yes.  He submits the paperwork and

12 then the case manager handles it on their end.  Once they

13 receive specific verification that they need, they'll contact

14 me and then I will reach out to the employer.  He puts

15 together a safety plan at RSA, and then after all of that is

16 approved, then he can begin work.

17    Q    Mr. Vanni, it sounds like the issue is that

18 Mr. Padilla states that he doesn't remember everything about

19 the night of the offense, correct?

20    A    He does not remember the offense conduct.

21    Q    Okay.  Well, he pled guilty to certain offense

22 conduct in court.  You realize that, correct?

23    A    If that's what you're telling me, then, yes, I

24 believe you.

25    Q    And that would -- well, you are the person who is

1    in charge of determining, or one of the people in charge of

2    making recommendations about whether or not Mr. Padilla is in

3    compliance by accepting responsibility, correct?

4        A    I'm part of the community supervision team, but

5    that final decision is made by treatment because they're the

6    professionals, specialists.

7        Q    Did you ever explain to the treatment providers

8    that Mr. Padilla pled guilty to this offense?

9        A    They were aware.

10       Q    And were they aware of the documentation including

11   a statement of facts for which Mr. Padilla admitted?

12       A    They receive the presentence report, and again, if

13   in reading it, he does not admit to the actual behavior.  He

14   states -- let me take that back.  He states that he accepts

15   that he is guilty, but he does not remember it because he was

16   blackout drunk.

17       Q    Mr. Padilla has been consistent that he was drunk

18   the night of the offense, correct?

19       A    Yes, he has been consistent in every single offense

20   he has ever committed that he has been blackout drunk, in all

21   of his domestic violences, in his violation of protection

22   orders, in his urination in public, in his public

23   intoxication, his indecent exposure, his public indecency,

24   every single thing that he has ever done, he does not

25   remember, he is consistent.

1      Q     You just listed all of these things.   Those are not

2    all convictions, correct?

3      A     They are.

4      Q     You -- are you familiar with people who have

5    alcoholism problems?

6      A     Yes.

7      Q     And is it your position that it's not possible to

8    get blackout drunk and not remember things?

9      A     I have never experienced anything like that so I

10   can't speak of it.  All I can say is in my experience with

11   people who have stated the same things as the defendant, that

12   they have eventually admitted to the offense conduct once

13   they work through whatever they need to work through.

14   Sometimes there is shame involved, sometimes there is guilt

15   involved.  They process through that and then eventually

16   they're able to admit to the offense.

17          I have yet to have worked with somebody who has

18   been in denial that was stating that they were blackout drunk

19   and that is -- is how it has ended.  This is the first time

20   that I have gone to court or had to file a petition or have

21   somebody else file a petition and go to court for this

22   reason.

23     Q     Well, each person that you supervise is a unique

24   individual.  You can't lump them all together; would you

25   agree with that?

1      A     Right.  I was just talking about as far as the

2  people of the last decade or so that have been in denial and

3  not talk about being blackout drunk.

4      Q     And how do you know that this -- that people don't

5  eventually just admit to something because of the fear of

6  going to jail if they don't admit it?  How can you assess

7  that a person is being genuine in their admission?

8      A     In not having a conversation and having a

9  conversation with the therapist who speak to them, that

10  they're presenting as open and honest at that time and

11  genuine.

12      Q     Well, Mr. Padilla is being open and honest with his

13  alcohol counselor, correct?

14      A     They're working through his inability to take

15  responsibility and accountability for his behaviors because

16  he was blackout drunk.  That's what they're working on.

17      Q     Well, they're also working on keeping him sober

18  since his alcoholism has caused him so many problems in his

19  life?

20      A     I'm -- that is one of his treatment goals is to

21  stay sober, yes.

22      Q     And he has succeeded in that treatment goal?

23      A     He has been sober as far as I know because I have

24  not received a positive breathalyzer or a positive UA.

25      Q     And if he is working through his alcoholism and

1  staying sober, it makes it less likely that he is going to

2  reoffend if this incident was fueled by alcohol, correct?

3       A    I do not know if he is -- what his likelihood of

4  re-offense is.  I don't have a crystal ball to answer that

5  question.

6       Q    Well, if this offense was fueled by alcohol and he

7  is staying sober, doesn't it make it less likely that he will

8  reoffend?

9       A    I -- who is stating it was fueled by alcohol?

10      Q    Mr. Padilla has stated that it was fueled by

11  alcohol.

12      A    Okay.

13      Q    Do you not believe him?

14      A    I again have had cases where someone has drank

15  alcohol and has been able to accept that they committed the

16  offense, but alcohol didn't make them commit the offense.

17      Q    So that's the problem here is that Mr. Padilla has

18  sometimes said that alcohol has made him commit the offense?

19      A    That's what you just said to me that it fueled it.

20      Q    Mr. Padilla is here because he doesn't remember the

21  offense because he was drunk, correct?

22      A    We are here because he does not take accountability

23  for the offense conduct because he is stating he was blackout

24  drunk.

25           THE COURT:  Can I interrupt cross-examination and

1    ask a question?

2              MS. CHRISTL:  I'm sorry.

3              THE COURT:  Can I you interrupt the

4    cross-examination to ask a question?

5              MS. CHRISTL:  Okay.  Your Honor, I have nothing

6    further.

7              THE COURT:  Okay.  Then I'll let redirect and I'll

8    ask my questions.

9              MR. FIELDS:  Thank you, Your Honor.

10                       REDIRECT EXAMINATION

11   BY MR. FIELDS:

12        Q    Sir, you were asked about buses between Denver and

13   Rapid City, South Dakota?

14        A    Correct.

15        Q    If the defendant was to make it to South Dakota, do

16   you know where he would be able to reside?

17        A    If he was to be released and find his way to his

18   hearing that was scheduled down the road by bus, where he

19   would reside in the Denver area?

20        Q    In South Dakota.  When he got there, if the bus got

21   there, say, the night before the hearing or, you know, a

22   couple days before the hearing, would he be able to -- would

23   he have a place to reside in South Dakota?

24        A    He doesn't have a place to reside in Denver and he

25   wouldn't have a place to reside in South Dakota.

1 Q Could he be put into a halfway house in South

2 Dakota?

3 A I do not know what their rules are, if they would

4 be willing to accept him now that he has been terminated

5 unsuccessfully from sex offender treatment.  In Colorado he

6 won't be able to get back into the halfway house, but I can't

7 speak for South Dakota.

8 Q Now, you mentioned the polygraph and the deception.

9 What was the -- what deception did the polygrapher indicate?

10 A Basically that when asked about him being blackout

11 drunk and not remembering engaging in the offense conduct.

12 Q So the deception is to whether or not he was

13 blackout drunk?

14 A Remembers the offense conduct most importantly.

15 Q Okay.  And when it comes to an offense like this,

16 are there -- is there another witness besides the defendant

17 to what actually happened?

18 A Repeat the question, please, I'm sorry.

19 Q Is the victim also a witness to the crime that

20 happened?

21 A Yes.

22 Q So is denying the offense also denying the victim's

23 statement of what happened?

24 A Correct.

25 Q So even if the defendant was blackout drunk, he can

1    still deny other statements and other witnesses, correct?

2         A    I don't understand.

3              THE COURT:  I honestly don't understand that

4    question.

5              MR. FIELDS:  Yeah, let me rephrase.

6         Q    (By Mr. Fields) So the victim says that the offense

7    happened?

8         A    Yes.

9         Q    Okay.  And he pleaded guilty to that offense?

10        A    Correct.

11        Q    So when he denies what happened, is he also denying

12   the victim's account of what happened?

13             THE COURT:  I don't think that's what the testimony

14   here has been.  I think the testimony here is that he is

15   admitting guilt to the offense.  He is admitting that what

16   happened happened, but he is saying, I don't remember it

17   because I was blackout drunk.  That's not the same thing as

18   him denying that he did the conduct.  It's him saying, I

19   don't remember.  Is than accurate recitation of the history?

20             MR. FIELDS:  Let me get to that.

21             THE WITNESS:  That's correct.

22        Q    (By Mr. Fields) So does he deny that the offense

23   took place?

24        A    If you could just give me one --

25        Q    Yes.

1     A    I would have to read that paragraph that the judge

2     has -- I apologize -- from RSA, the paperwork.

3          THE COURT:  That's fine.  I mean, I have the

4     paperwork here.  It has been admitted.  I can give it back to

5     him.

6          THE WITNESS:  Would you like me to get up?

7          THE COURT:  Yeah.

8          THE WITNESS:  Thank you.  I appreciate it.

9     A    So it states, getting his timely treatment,

10    Mr. Padilla presented several different versions of his

11    account of the night he offended.  He also demonstrated an

12    unwillingness to give open feedback and that either used

13    inappropriate humor or anger to deflect.  During his last

14    group on January 25, 2018, Mr. Padilla fully regressed back

15    to his original statement of not remembering the night of the

16    offense due to being blackout drunk.

17    Q    (By Mr. Fields) Okay, but before that he would

18    evade questions altogether about the offense?

19    A    Yes, he would deflect by again using humor or

20    anger.

21    Q    And is admitting that you're guilty in court

22    different than accepting responsibility in a therapy session?

23    A    Correct.

24    Q    How is it different?

25    A    You -- I mean, you could -- there is Alford Pleas.

1    There is lot of things that can happen in a courtroom that is

2    different than what happens once you are accepting offense

3    conduct within treatment.

4        Q    Well, crimes have certain elements, right?

5        A    Correct.

6        Q    So can you admit to the elements of a crime without

7    fully describing the conduct that encompasses the activity?

8        A    Correct.

9            MR. FIELDS:  No further questions, Your Honor.

10           THE COURT:  All right, I've got some questions.

11           First of all, obviously what is at issue in this

12   entire violation is whether or not the -- Mr. Padilla has

13   violated the conditions of his supervised release by being

14   kicked out of RSA because he refuses to admit to remembering

15   the conduct at issue.  Is that a fair summary?

16           THE WITNESS:  I think that there are other elements

17   that would come in a full discharge report as far as what

18   we're talking about with the humor and the anger and the

19   unwillingness, but, yes, in a nutshell.

20           THE COURT:  Okay.  Now, you were asked some

21   questions -- I'm assuming you reviewed the pretrial -- or the

22   presentence report prior to -- at least prior to supervising

23   Mr. Padilla?

24           THE WITNESS:  Correct.

25           THE COURT:  And in that -- and you were asked a

1    question of -- about his drinking.

2              In that pretrial services report it says that he

3    was drinking a pint of whiskey approximately one time per

4    month, including the last time he drank on February 25, 2017,

5    which was the date in question.  Is that -- do you recall

6    seeing that?

7              THE WITNESS:  Yes.

8              THE COURT:  And it also says -- I think you were

9    asked the question of whether he was drinking heavily after

10   his father passed away, and it says on paragraph 52 that his

11   father passed away in 2016 due to liver disease.  So

12   within -- I don't know when that was, but within at most 14

13   months of the date in question.  Is that true?

14             THE WITNESS:  Father passed away 2016, correct,

15   yes.

16             THE COURT:  Now, let's assume for a moment --

17   because you're not a psychiatrist, none of us here are

18   psychiatrists, but I think, and I can tell the parties where

19   I'm going with this is going to be supplemental briefing, but

20   I'm fairly certain that there is a recognized understanding

21   in the -- whether -- it's probably psychology, but in whoever

22   are experts in field, probably psychologists, that there is a

23   recognized understanding that if you drink enough, you can

24   forget events that occur.  Now, again, I'm going to one

25   supplemental briefing, but it's my understanding that that is

1    a recognized phenomenon.

2            If that's the case and that occurred here, what can

3    Mr. Padilla do to remain in sex offender treatment if what he

4    is saying is the truth, that he truly does not remember this?

5    It seems that he can either lie or get booted out of

6    treatment.  So that's my question.

7            Let's assume for a moment that he is telling the

8    truth, that he truly cannot recall the details of what he did

9    in this incident.  And I've read the facts as outlined in the

10   plea agreement and it appears to be a fairly quick incident,

11   not something that went over a prolonged period of time that

12   evening, but fairly quick.

13           Let's assume for a moment that he truly cannot

14   remember doing that.  What can he do to remain in sex

15   offender treatment?

16           THE WITNESS:  I do not know, Your Honor.

17           THE COURT:  So the answer is nothing, I think; is

18   that true?

19           THE WITNESS:  At this point I would say yes.

20           THE COURT:  Okay.  Any follow-up based on my

21   questions?

22           MS. CHRISTL:  No, Your Honor.

23           MR. FIELDS:  No further examination, Your Honor.

24           THE COURT:  Or.  You can be excused.  Any further

25   witnesses for the Government?

1          MR. FIELDS:  No, Your Honor.

2          THE COURT:  For the defense?

3          MS. CHRISTL:  No, Your Honor.

4          THE COURT:  All right.  I want to hear my argument

5    with my last questions, what in the world is Mr. Padilla

6    supposed to do if he truly cannot remember the incident?

7          MR. FIELDS:  Your Honor, that goes to the substance

8    of the hearing.  Right now we're here for probable cause.  Is

9    there probable cause to believe that there is a violation?

10   And there is.  He was --

11         THE COURT:  How so?  How have you presented

12   probable cause to demonstrate that he has knowingly and

13   intentionally violated the terms of his supervised release

14   because he is saying he cannot remember the incident?  How is

15   there probable cause to believe that he is lying?

16         MR. FIELDS:  Your Honor, we don't have to get to

17   that.  It's actually much more formalistic than that.  It's

18   did he successfully complete the program?  The answer to that

19   is no.

20         THE COURT:  But is there an intent requirement?

21   Can you violate somebody for supervised release for a

22   truthful action?

23         MR. FIELDS:  I don't --

24         THE COURT:  That you've put him in the situation

25   where if what he is saying is true, and you're telling me if

1  you have no evidence that he's lying on it, that it's not --

2  you're not faulting him for that.  I don't know how we could

3  determine that.  If what he's saying is true, he is stuck

4  with either lying, which in and of itself would be a

5  violation of his supervised release, or telling the truthful

6  answer, which is he doesn't recall.

7        MR. FIELDS:  Your Honor, I think that might be

8  correct, but that goes to the substance of whether or not he

9  actually violated.  The question now is, Is there probable

10  cause?

11        THE COURT:  Okay.

12        MR. FIELDS:  There is probable cause.  He was

13  unsuccessfully discharged, and I don't think we have to get

14  into the intent on that.  You just look at the conditions.

15  You look at the discharge.  There is probable cause.  This

16  goes to South Dakota and the district judge in South Dakota,

17  if he wants briefing on this, if he wants experts, if he

18  wants all of that stuff to figure out whether or not there

19  was actually a violation, that's where all of that should

20  take place.

21        THE COURT:  Except that I have to find probable

22  cause I think that there was an intentional violation.

23        MR. FIELDS:  The condition doesn't say anything

24  about intent.  All it says is did he successfully complete

25  the program.

1          THE COURT:  But isn't there a constitutional

2     requirement that he in some way -- that there is to be some

3     intent component of it?  Can I detain somebody?  Because

4     ultimately the whole reason we have preliminary hearings is

5     because the Supreme Court said I cannot detain somebody

6     pending a violation hearing without finding a violation of --

7     probable cause of a violation of supervision.

8          Is there some constitutional requirement that that

9     be probable cause that that violation be intentional?

10          MR. FIELDS:  I can brief that, Your Honor.

11          THE COURT:  Okay.

12          MR. FIELDS:  But I think in terms of what actually

13     happened and is there a violation, that's for South Dakota,

14     but in terms of was there --

15          THE COURT:  I agree whether is there a violation

16     for South Dakota, I absolutely agree with that.  The question

17     I have is, Is there probable cause?  And so that's what I

18     want.  I want further briefing on this issue because I think

19     it is a serious constitutional question.  I think ultimately

20     as the (inaudible) indicates, a portion of that question,

21     which is can he be deemed to violate his supervised release

22     based on the -- and a truthful answer that he doesn't recall

23     something I think is a serious constitutional question, but

24     that's one I don't have to answer.  That's one for the

25     district court judge.

1          The one I have to answer is, Is there probable

2    cause to believe that?  And I want further briefing on that

3    issue.  And again, as part of that, I want -- I think the

4    parties are going to have to touch on the issue that is for

5    the district court judge, but the second component of it is,

6    Do I need to find probable cause of some intentional or

7    reckless or so many other volitional aspect of the violation?

8    Ultimately can I find probable cause if there is no probable

9    cause to believe that he has done anything other than tell

10   the truth that he doesn't recall the incident?  And that's

11   what I don't know the answer of, but I do want briefing.

12          How quickly can the parties turn around briefing on

13   that issue?

14          MR. FIELDS:  I could try to get it to you by the

15   end of the week, Your Honor.

16          THE COURT:  Okay, that's fair.

17          MS. CHRISTL:  Your Honor, I can do it.

18          THE COURT:  Okay.  Then I'm going to continue this

19   until next Monday at 10 a.m.  I'll order the defendant

20   detained pending that hearing because I do think from the --

21   from the presentence report that if I were to find a

22   violation, I think I would be inclined to find detention

23   appropriate, but I'm not making that decision yet.  I will

24   defer that until the 16th, but I find that is at least

25   sufficient here to order him detain pending my ruling on the

1   16th, okay.

2          Anything further that we can do here today?

3          MR. FIELDS:  Your Honor, I just want to make sure

4   that I have the questions clear for briefing.

5          THE COURT:  Yeah.  I'm not sure I gave them real

6   clear, because I'm not exactly sure what they are in my own

7   mind yet, but go ahead.

8          MR. FIELDS:  So I guess my summary of it would be,

9   Does the probable cause determination require evidence of

10  intent?

11         THE COURT:  That's one aspect of it, yes.

12         MR. FIELDS:  And the other one is, For purposes of

13  this hearing, is it enough to find probable cause or do you

14  have to get into the substance of the violation?

15         THE COURT:  Yeah.  I think ultimately the problem

16  that I'm struggling with is I don't think there has been any

17  evidence presented, at least sufficient evidence presented,

18  to believe that there is -- to find probable cause that his

19  statement that I don't remember what happened that night is a

20  lie.  In fact, I think that there is -- there is indications

21  in the presentence report that he was drinking on that day,

22  that he was drinking up to a pint.  He has consistently said,

23  I don't recall what happened.

24         And I think, but again if I'm wrong on this,

25  certainly the Government can point me to where I'm wrong, but

1    I think that the experts in this field will say that it is

2    a -- it can certainly happen, that if you drink heavily on a

3    night in question, you can forget aspects of what happened

4    that night.

5              Again, if I'm wrong on that, then please point me

6    to where I'm wrong, but I think that that is accurate.

7              So if that's all true, then can I find probable

8    cause that he violated his supervision by simply giving

9    truthful answers to questions?  And I'm not sure exactly how

10   best to frame that question --

11             MR. FIELDS:  Okay.

12             THE COURT:  -- Because I think that it's a

13   difficult issue, but that's ultimately where I need to get to

14   because certainly I have found -- I think it's

15   uncontradicted -- that he has been booted out of sex offender

16   treatment and has not successfully completed sex offender

17   treatment.  That's absolutely true, he got booted out.

18             But, you know, I mean, let's take a hypothetical

19   that's a -- and I'll just throw this hypothetical out there.

20   Let's say they booted him out because he was Hispanic.

21   That's obviously not what happened here, but let's say a

22   clear constitutional reason -- unconstitutional reason for

23   booting him out, RSA does not like Hispanic men, and so they

24   would boot him out for that.

25             Well, I could find probable cause that he didn't

1    successfully complete sex offender treatment, and then under

2    your explanation, I could then boot this over to the district

3    court judge to determine whether that's an unconstitutional

4    reason to boot him out of sex offender treatment and whether

5    it can be violated based on that, but I'm guessing that the

6    answer to that question is I can't detain him and bind him

7    over to South Dakota when the premise for him being kicked

8    out was because they don't likely Hispanic men.

9        This isn't exactly the same, but this is why I'm

10   saying I think ultimately I may have to get into, at least to

11   some extent, the question of can he be found to violate his

12   conditions based upon truthful answers, which the clear

13   testimony in response to my questions was there is nothing he

14   can do.  If that truly is what happens, that he doesn't

15   recall that night, he is getting booted out.  So --

16       MR. FIELDS:  Your Honor, may I say two things to

17   that?

18       THE COURT:  Yeah, absolutely.

19       MR. FIELDS:  So first with your example of the

20   unconstitutional discharge based on race, I do think that

21   would be extremely concerning to me, but I think in terms of

22   is there -- would there be a probable cause determination?

23   Yes, go to the district judge.

24       Even if Your Honor were to decide it was

25   unconstitutional here, there would be an appeal because our

1   office isn't in control of this.  It's South Dakota, and then

2   it would get handled in South Dakota anyways.

3          THE COURT:  I'm sure there will be an appeal.  I

4   have little doubt about that, but nonetheless, I have to

5   decide as an initial matter I can't abdicate my duties

6   because there may be an appeal.

7          MR. FIELDS:  Understood, Your Honor.

8          THE COURT:  And if you -- I mean, (inaudible) is a

9   great example to put into your brief as to if ultimately that

10  were to happen, my hypothetical, and I will require to say

11  yes, there is probable cause, point me to something saying

12  that.  If that's what the law is -- you know, if that's what

13  the law is, I'll follow what the law is.  I just don't -- I

14  don't know where that line is, which is why I want

15  supplemental briefing on the issue.

16         MR. FIELDS:  I will not be briefing that exact

17  example because it's pretty loaded.  We certainly would not

18  keep someone discharged because they were discriminating on

19  the basis of race, so I wouldn't use that example.

20         THE COURT:  But I don't know what the answer to

21  that one is.  I mean, it may be that that's probable cause

22  and, therefore, I don't get behind it, and if that's answer

23  to the question, then -- you know, then I'll follow what the

24  law is.  I don't know what the law is, which is why I want

25  the supplemental briefing on this issue.

 1          MR. FIELDS:  And the second point is there was

 2    testimony about the polygraph and that he was deceptive,

 3    particularly with the question of was he blackout drunk.  And

 4    I think that would also be perhaps an alternative way to find

 5    probable cause.

 6          THE COURT:  And you can certainly address that in

 7    the supplemental briefing.

 8          MR. FIELDS:  Okay.

 9          THE COURT:  Anything further from the defense?

10          MS. CHRISTL:  Your Honor, do you want them just to

11    be filed by a certain day or filed at the same time?

12          THE COURT:  By Friday at 5 p.m.

13          MS. CHRISTL:  Okay.  And just both of us file?

14          THE COURT:  Simultaneous, yes.

15          MS. CHRISTL:  Okay, thank you.

16          THE COURT:  And if you want to address the

17    hypothetical that I raised too, I mean, I think that it's --

18    if there is an answer to that hypothetical, there may be an

19    answer to this question.

20          MS. CHRISTL:  Okay, thank you.

21          MR. FIELDS:  Your Honor, sorry, one more thing.

22          THE COURT:  Sure.

23          MR. FIELDS:  I would expect that this will get into

24    the substance of the offense a little bit, so for that

25    reason, would Your Honor have any problem with filing it

1    under seal?

2            THE COURT:  I don't have -- I don't have any wish

3    it being filed under seal.  You'll obviously need to file the

4    motion to have it under seal, but I don't have any issue with

5    that.

6            I'm not sure it's necessary.  I mean, I'm guessing

7    the record out of South Dakota is public, with the exception

8    of obviously the juvenile's name is initialed or redacted in

9    some way, and I would absolutely require the parties to

10   redact or, you know, the juvenile's name, but if it's public

11   in South Dakota, I don't know that it needs to be public

12   here.  I think redaction would be sufficient.

13           MR. FIELDS:  Thank you, Your Honor.

14           THE COURT:  Thank you.  All right.  We'll be in

15   recess, thank you.

16           (Whereupon, the within hearing was then in

17   conclusion at 11:38 a.m.)

18

19

20

21

22

23

24

25

1    I certify that the foregoing is a correct transcript to the

2    best of my ability to hear and understand the audio recording

3    and based on the quality of the audio recording from the

4    above-entitled matter.

5

6    /s/ Dyann Labo                      July 11, 2018

7    Signature of Transcriber            Date

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2    WITNESSES                         PAGE

3    Walter Vanni

4    Direct by Mr. Fields             3, 31
     Cross by Ms. Christl             11
5    Court                            35

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**PATTERSON TRANSCRIPTION COMPANY**
scheduling@pattersontranscription.com